**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | |
| ALLY FINANCIAL INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 14-02435 (MG) |
| WELLS FARGO BANK, N.A., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION TO DISMISS**

*A P P E A R A N C E S :*

BAKER & McKENZIE LLP
*Attorneys for Defendant*
452 Fifth Avenue
New York, New York 10018
By:    James Donnell, Esq.
        Jacob M. Kaplan, Esq.

KORNSTEIN VEISZ WEXLER & POLLARD, LLP
*Attorneys for Plaintiff*
757 Third Avenue
New York, New York 10017
By:    William B. Pollard, III, Esq.
        Amy C. Gross, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") motion (the "Motion," ECF Doc. # 9) to dismiss the complaint (the "Complaint," ECF Doc. # 1) in the above-captioned adversary proceeding (the "Adversary Proceeding") filed by Plaintiff Ally Financial Inc. ("AFI"), the non-debtor parent company of the former debtor Residential Capital, LLC ("ResCap"). AFI filed an opposition (the "Opposition," ECF Doc. # 16) and Wells Fargo filed a reply (the "Reply," ECF Doc. # 17).

This Adversary Proceeding arises out of deposit accounts opened by AFI and certain of its debtor and non-debtor affiliates and subsidiaries with Wells Fargo. The parties entered into the contract to open the accounts in January 2012. Two months later, apparently in anticipation of the bankruptcy filings by ResCap, Wells Fargo used the "change of terms" provision in the account agreement and unilaterally amended the agreement with AFI. The amendment expanded the indemnification provision in the agreement, making AFI liable as a guarantor for any debts to Wells Fargo of ResCap and its debtor affiliates (collectively, the "Debtors"). The notice of the unilateral amendment gave AFI 37 days to close the accounts or the amendment was deemed accepted. (The account agreement required that Wells Fargo give AFI 30 days' notice of any change of terms.) AFI's Complaint alleges that it was unable to close all of the accounts by the deadline (because of the extensive use of the accounts and the number of checks outstanding) and the amendment became effective before the Debtors filed their bankruptcy petitions approximately three weeks later. Wells Fargo thereafter debited funds from AFI's accounts to satisfy amounts Wells Fargo claimed were owed by the Debtors, allegedly incurred before and during the Debtors' bankruptcies. These amounts (approximately $500,000) primarily related to attorneys' fees that Wells Fargo incurred in monitoring the Debtors' bankruptcy cases.

2

AFI alleges that Wells Fargo's unilateral amendment of the account agreement and debiting of AFI's account were improper, giving rise to damages claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion.  AFI also requests declaratory relief.  Wells Fargo's Motion to dismiss argues that the plain language of the contract permitted the amendment and, therefore, as a matter of law, AFI's claims must be dismissed.

AFI and Wells Fargo were both obviously sophisticated parties.  The change of terms contract language is clear and unambiguous and is enforceable under applicable New York law.[1] While the Court believes that Wells Fargo engaged in what can only be described as "sharp practices," Wells Fargo acted in accordance with the terms of the parties' contract.  AFI cannot rewrite the terms of the contract with the benefit of hindsight.

Therefore, as set forth below, Wells Fargo's Motion is **GRANTED** and AFI's Complaint is **DISMISSED with prejudice** as to the breach of contract, conversion, and part of the breach of the implied covenant of good faith and fair dealing claims.  AFI's remaining theory of breach of the implied covenant—that Wells Fargo acted uncooperatively in carrying out its own requisite procedures for closing accounts—is **DISMISSED without prejudice** and AFI is **GRANTED** leave to amend to better allege this claim.

---

[1]     The relevant contract includes the following applicable law clause:

> Our relationship with you is governed primarily by the agreement.  However, it is also governed by the laws of The United States of America; applicable state law, the rules and regulations of the Board of Governors of the Federal Reserve System and various Federal Reserve Banks; and the rules and regulations of other bank supervisory authorities and other governmental agencies having jurisdiction over us.  To the extent that State law applies to our relationship with you, the applicable law is the law of the State in which your account was opened as identified in our records.

(Compl. Ex. A § 18.)  Due to the number of the accounts that were opened pursuant to the agreement, which may or may not have been opened in different states, this provision did not provide a clear answer as to which states' laws apply to this Adversary Proceeding.  After the Motion was filed, but before the Opposition was filed, the parties stipulated that New York law would apply to the adjudication of this case.  (*See* ECF Doc. # 13.)  As such, this Opinion applies New York law to resolve the Motion.

# I.    BACKGROUND

## A.    The Parties' Original Contractual Relationship

AFI, directly or through its subsidiaries, is one of the largest providers of automotive financing and leasing products and services in the United States.  (Compl. ¶ 14.)  The Debtors were separate and independent legal entities that were direct or indirect subsidiaries of AFI and were engaged in the mortgage loan origination, securitization, and servicing businesses.  (*Id.* ¶ 16.)

On January 3, 2012, AFI and certain of its affiliates and subsidiaries, including the Debtors, executed a commercial deposit agreement (the "CDA," Compl. Ex. A) with Wachovia Bank and Wachovia Bank of Delaware.  (Compl. ¶ 17.)  Both Wachovia entities were succeeded by Wells Fargo.  (*Id.*)  The CDA sets forth terms and conditions relating to commercial deposit accounts that AFI, the Debtors, and the other signatories maintained with Wachovia, and later Wells Fargo.  (*Id.* ¶¶ 15, 17(citing CDA).)  Approximately 30 of these accounts were checking accounts relating to AFI's auto financing and services business (the "Ally Auto Services Accounts").  (*Id.*)  One of the accounts (the "AFI Funding Account") was a main funding account that was used to transfer funds to cover checks issued from the Ally Auto Services Accounts.  (*Id.*)  The Debtors' accounts were not used in AFI's auto services business.  (*Id.*)

In its original form, the CDA contained the following relevant provisions:

> Throughout this deposit agreement, Wachovia Bank and Wachovia Bank of Delaware, each a division of Wells Fargo Bank, N.A., as applicable, are referred to as "we" or "us," the commercial deposit accounts we offer are referred to as the "accounts," the treasury management services that we offer are referred to as the "treasury services," this deposit agreement and the other documents described below are together referred to as the "agreement;" and: 1) each entity maintaining an account or using any of the services listed on Exhibit A hereto; and 2) each such entity is individual referred to herein as "you."

4

(the "Defining Terms Provision," CDA at 1);

> When you open an account and accept service from us, you agree to be bound by the terms and conditions of the agreement.

(*id.*);

> We may amend this agreement and any documentation referred to herein and the rules related to your account at any time.  We will provide you 30 days prior notice of any such changes or amendments if they are not in your favor.  If you continue to use such services after such notice you will be deemed to have accepted such changes.  Notwithstanding the forgoing, we may make such changes immediately where required to do so including amendments required by changes in law, regulation, applicable clearinghouse rule or in any other circumstance that prohibits the giving of such prior notice.

(the "Amendment Provision," *id.*);

> In the event that any provision of the agreement is held to be invalid, illegal or unenforceable for any reason, the remaining provisions of the agreement will remain in full force and effect.

(*id.* § 16);

> Except as may be limited by applicable law and except to the extent losses, claims, and expenses are finally determined by a court or arbitrator having proper jurisdiction have been caused by our negligence or our willful misconduct or by our breach of our obligations under the agreement, you agree to indemnify and hold us . . . harmless from (or at our election and where appropriate to reimburse us for) any and all losses, costs and expenses (including attorneys' reasonable fees and costs) resulting from:
>
> (a) claims brought against us by any person or entity arising in connection with any of the services or treasury services provided under the agreement . . . ;
>
> . . .
>
> (d) obligations, losses or expenses we incurred in connection with any legal process, dispute or third-party claim related to you or your accounts;

. . .

These indemnification obligations will survive the termination of any treasury services in whole or in part or the termination of the agreement.

(the "Indemnification Provision," *id.* § 21);

If you ever owe us money as a customer, borrower, guarantor or otherwise including any obligation owed to us for services provided pursuant to this agreement or owed to a financial institution that we acquire, then you agree that, in addition to any other remedies we may have, we have the right to deduct and set off amounts you owe us from any accounts you hold with us or our affiliates.

By accepting services, you also grant us a consensual security interest in your accounts and to the funds held in them as collateral to secure your present and future obligations to us.

With the exception of charging an account for items that may be returned against it, we will not set-off against – and you do not grant us a security interest in – any account for money owed us where the account name indicates, and you actually do, hold the funds in such account in a representative capacity.

(the "Setoff Provision," *id.* at 17);

The CDA contains three signature pages, with authorized signatures for AFI and each of AFI's subsidiaries and/or affiliates that opened accounts.  (*See id.* at 23–25.)  For each of the entities, the same individual or individuals signed on behalf of the entity, executing and accepting the terms of the CDA.  (*See id.*)  The CDA attaches a list as Exhibit A of each of the AFI entities to which the CDA applies:  AFI, Ally Servicing LLC, Motors Insurance Corp., ResCap, Debtor Residential Funding Co., LLC, Debtor Passive Asset Transactions LLC, Debtor RFC Asset Holding II, LLC, Debtor Residential Mortgage Real Estate Holdings, LLC, Debtor Residential Funding Real Estate Holdings, Debtor Homecoming Financial Real Estate Holding,

Debtor GMACM Mortgage, LLC, Debtor Ditech, LLC, and Debtor Residential Consumer

Services, LLC (together, the "Depositors").  (*See id.* Ex. A.)

> **B.**     **Wells Fargo's Amendment to the CDA**

Wells Fargo sent the Depositors, including the Debtors and AFI, a letter dated March 19,

2012, stating that it was amending the CDA (the "Amendment").  (*See generally* Compl. Ex. B.)

The Amendment included amended and/or new provisions, including a guarantee provision,

which states in pertinent part:

> a.  GUARANTY; DEFINITIONS.   In consideration of [Wells Fargo's] continued provision of treasury management services to the Ally/ResCap Entities under this agreement, notwithstanding the right of [Wells Fargo] to cease the provision of such services, and for other valuable consideration, ALLY FINANCIAL, INC. ("Guarantor"), jointly and severally unconditionally guarantee and promise to pay [Wells Fargo], or order, on demand in lawful money of the United States of America and in immediately available funds, any and all Indebtedness of any Subsidiary ["Subsidiaries being defined as a variety of the Debtor entities] to [Wells Fargo] **arising out of or relating in any way to any deposit account maintained by Subsidiary with [Wells Fargo], or any treasury management service offered by [Wells Fargo] which is purchased or otherwise utilized by Subsidiary** . . . The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Subsidiary, or any of them . . . .
>
> . . .
>
> f.  [Wells Fargo's]   RIGHTS   WITH   RESPECT   TO GUARANTOR'S   PROPERTY   IN   [Wells   Fargo's] POSSESSION.  In addition to all liens upon and rights of setoff against the monies, securities or other property of Guarantor given to [Wells Fargo] by law, [Wells Fargo] shall have a lien upon and a right of setoff against all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with [Wells Fargo], whether held in a general or special account or deposit or for safekeeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Guarantor.  No lien or right

> of setoff shall be deemed to have been waived by any act or
> conduct on the part of [Wells Fargo], or by any neglect to
> exercise such right of setoff and lien shall continue in full force
> and effect until such right of setoff or lien is specifically
> waived or released by [Wells Fargo] in writing.

(*Id.* at 4 (emphasis in original).)  The Amendment also indicated that continued use by the

Depositors of the accounts covered by the CDA after April 25, 2012 (37 days after the letter was

dated) would be deemed consent to the amendments.  (Compl. ¶ 25; *id.* Ex. B at 2.)  The

Amendment changed other provisions of the CDA, such as the subordination of AFI's claims

against the Debtors to any claims of Wells Fargo against the Debtors and a modification of the

indemnity obligations with AFI agreeing to indemnify Wells Fargo for any losses incurred in

connection with accounts that were the source or recipient of funds transferred to or from AFI.

(Motion at 5 n.2 (citing Compl. Ex. B).)

### C.     AFI's Closure of Its Accounts with Wells Fargo

After receiving the March 19, 2012 letter, AFI sought to reject the Amendment and

initiated the process of closing its accounts with Wells Fargo.  (Compl. ¶ 29.)  The Complaint

alleges that AFI made diligent efforts to close all of its accounts with Wells Fargo as soon as

commercially reasonable.  (*Id.*)  The Complaint alleges that AFI informed Wells Fargo that

closing the Ally Auto Services Accounts within the allotted 30 day time period posed a serious

business risk to AFI because AFI had issued thousands of checks drawn on those accounts that

remained unpaid at the time the Amendment was sent and AFI could only close each account

after the checks drawn had been paid, escheated, or reissued; AFI did not want to risk those

checks being returned unpaid or otherwise unable to clear due to the closing of the accounts.

(*Id.*)  The Complaint further alleges that AFI had to establish accounts at a new bank for its auto

services business, a process that would take more than 37 days to accomplish given the

complexity of the accounts, a fact Wells Fargo allegedly knew.  (*Id.* ¶ 30.)  The Complaint also

alleges that closing the Wells Fargo accounts required Wells Fargo's approval in accordance

with its internal administrative process.  (*Id.* ¶ 31.)  AFI alleges that Wells Fargo therefore

controlled the timing of the closing of any account upon AFI's request for account closure.  (*Id.*)

The Complaint alleges that Wells Fargo was fully aware of the processes required to close such

accounts and open new ones and the time needed to do so.  (*Id.*)  AFI alleges that it sought to

work amicably with Wells Fargo to transition the accounts from Wells Fargo to a new bank, but

Wells Fargo was uncooperative and unresponsive.  (*Id.* ¶ 32.)  Despite AFI's efforts, AFI was

unable to close the more than 30 accounts by the April 25, 2012 deadline.  (*Id.* ¶ 33.)

### D.    The Debtors' Bankruptcy

The Debtors filed chapter 11 bankruptcy petitions beginning on May 14, 2012.  (*Id.* ¶ 34.)

Wells Fargo's attorneys from Winston & Strawn LLP ("W&S") appeared at several hearings

before this Court.  (*Id.* ¶ 35.)  Throughout the bankruptcy proceedings, Wells Fargo's counsel

argued that counsel needed to protect Wells Fargo's interest during the Debtors' bankruptcy

proceeding, but when pressed by the Court, its counsel was unable to articulate exactly what that

interest was and in fact admitted that Wells Fargo was not "aware of any claims [it had against

the Debtors] as of [June 18, 2012]."  (*Id.* ¶¶ 35–36 (citing *id.* Ex. D) (quoting June 18, 2012 Hrg.

Tr. at 56:8, 57:12–13, ECF Doc. # 472; Nov. 19, 2013 Hrg. Tr. 245:18–21, ECF Doc. # 5971).)

Wells Fargo's counsel filed multiple proofs of claim, asserting unliquidated claims with no

articulated basis, but attaching the CDA, the Amendment, and other related account documents

and service descriptions.  (*Id.* ¶ 37 (citing *id.* Ex. E).)

W&S charged Wells Fargo legal fees in connection with the Debtors' bankruptcy cases even though all of the Debtors' Wells Fargo accounts were officially closed on or before June 12, 2012.  (*Id.* ¶ 38 (citing ECF Doc. # 6019-1).)

### E.    Wells Fargo Debits Funds from the AFI Funding Account

In a letter dated May 4, 2012, Wells Fargo requested payment from AFI of $88,159.39 in legal fees for services rendered by W&S from December 27, 2011 through February 29, 2012. (*Id.* ¶ 40.)  The services were allegedly rendered "in connection with the implementation and administration of this agreement, including amendment" and before the Amendment became effective.  (*Id.*)

On November 29, 2012, Wells Fargo requested payment by AFI in the amount of $384,486.01 for the reimbursement of fees charged for services allegedly related to Wells Fargo's participation in the Debtors' bankruptcy involving the Debtors' accounts.  (*Id.* ¶ 41.)

After AFI contested the requests for payment of legal fees, Wells Fargo provided AFI with redacted invoices of the legal expenses.  (*Id.* ¶ 42.)  The Complaint alleges that the redacted invoices contained no description of the alleged work for which Wells Fargo sought to hold AFI responsible beyond stating that the work was for "Res/Cap."  (*Id.*)

On December 18, 2012, after reviewing the redacted invoices, AFI's counsel wrote to Wells Fargo's counsel questioning the reasonableness and propriety of the fees and counsel's billing practices.  (*Id.*)  Wells Fargo responded by letter dated December 21, 2012 (received by AFI on December 24, 2012), stating that Wells Fargo planned to debit AFI's accounts to pay the Debtors' alleged obligations for Wells Fargo's legal fees.  (*Id.* ¶ 43.)  The letter asserted that Wells Fargo had the right to debit the account pursuant to the Amendment to the CDA.  (*Id.*)  On December 26, 2012, one business day after AFI received the letter, Wells Fargo took

10

$472,619.57 from the AFI Funding Account in satisfaction of the Debtors' alleged obligation to pay Wells Fargo's legal fees.  (*Id.* ¶ 44.)

AFI requested that Wells Fargo return the funds and desist from further conversion of AFI's money.  (*Id.* ¶ 45.)  On December 10, 2013, Wells Fargo agreed to return $100,000 to AFI subject to a release agreement (the "December 10, 2013 Release Agreement").  (*Id.* ¶ 46; *see* Motion Ex. 1).)  In accepting this payment, AFI specifically reserved its claim to the remaining $372,619.57 taken from AFI's account.  (Compl. ¶ 46.)  The December 10, 2013 Release Agreement also provides the following release of:

> any and all known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising claims and Causes of Action arising from or related to the Deposit Agreement or the Purported Amendment, including Winston's fees and expenses incurred in representing [Wells Fargo] regarding the Debtors and Ally.

(Motion Ex. 1 ¶ 2.)  On December 12, 2013, Wells Fargo returned the agreed upon $100,000 to AFI.  (*Id.*)

AFI has since demanded that Wells Fargo return the remaining funds debited from the AFI Funding Account, but Wells Fargo has refused to do so.  (*Id.* ¶ 47.)

### F.    Causes of Action

The Complaint asserts three causes of action and a request for a declaratory judgment. The first cause of action sounds in breach of contract.  (*Id.* ¶¶ 48–57.)  According to AFI, the CDA did not provide Wells Fargo with the right to (1) unilaterally amend the agreement to make AFI guarantor of any of the Debtors' liabilities with respect to the Debtors' accounts with Wells Fargo, (2) take funds from AFI's accounts to satisfy the Debtors' alleged debts to Wells Fargo, or (3) impose liens on AFI's property.  (*Id.* ¶ 49.)  The Complaint asserts that the Amendment (1) was commercially unreasonable and unconscionable, (2) was purportedly made with no

consideration provided in exchange, (3) purports to create, without AFI's consent, a new

obligation on AFI's part that was not contemplated by the parties or the original CDA, and (4)

did not provide AFI with enough time to close the accounts if it sought to reject the amendments.

(*Id.* ¶¶ 50–53.)  The Complaint alleges that Wells Fargo breached the CDA when it sought to

impose the third party guarantor obligation on AFI and when it debited money from the AFI

Funding Account without AFI's consent, for purposes not permitted by the CDA.  (*Id.* ¶ 55.)

The Complaint further alleges that Wells Fargo breached the CDA when it debited funds from

the AFI Funding Account to pay Wells Fargo's legal fees purportedly relating to the Debtors

because the fees were unnecessary and unreasonably incurred.  (*Id.* ¶ 56.)  For this cause of

action, AFI seeks $372,619.57 in damages—the amount withdrawn from the account less the

$100,000 returned—plus interest.  (*Id.* ¶ 57.)

Second, AFI asserts a claim for breach of the implied covenant of good faith and fair

dealing.  (*Id.* ¶¶ 58–63.)  The Complaint asserts that the CDA contains an implied promise that

Wells Fargo would act in good faith and deal fairly with AFI and that Wells Fargo's conduct in

attempting to unilaterally amend the CDA lacked good faith, constituted unfair dealing, and was

arbitrary and irrational.  (*Id.* ¶¶ 59–60.)  The Complaint alleges that this claim is separate from

the breach of contract claim, but is also asserted in the alternative.  (*Id.* ¶ 61.)  AFI asserts that it

was injured when Wells Fargo wrongfully took funds from the AFI Funding Account under the

purported Amendment and is therefore entitled to damages in the amount of $372,619.57 plus

interest.  (*Id.* ¶¶ 62–63.)

Third, the Complaint pleads a conversion claim.  (*Id.* ¶¶ 64–67.)  The Complaint asserts

that the money in the AFI Funding Account belonged to AFI, Wells Fargo took funds from the

account without AFI's consent and without contractual authority to do so, and Wells Fargo

thereby exercised dominion over and interference with AFI's funds in derogation of AFI's rights. (*Id.* ¶¶ 65–66.)  AFI asserts that it is entitled to damages in the amount of $372,619.57, plus interest.  (*Id.* ¶ 67.)

The Complaint further seeks a declaratory judgment that Wells Fargo's attempted Amendment to the CDA is illegal and invalid.  (*Id.* ¶¶ 68–71.)

### G.     The Motion

Wells Fargo's Motion seeks to dismiss the Complaint in its entirety.  According to Wells Fargo, the breach of contract, conversion, and declaratory judgment claims must be dismissed because the CDA expressly permitted Wells Fargo to take the actions it took.  (Motion ¶¶ 13–25.)  Wells Fargo argues that each of these claims requires a finding that Wells Fargo was not entitled to amend the CDA; Wells Fargo submits that the CDA expressly gave Wells Fargo the right to amend the agreement and provided that AFI was deemed to have accepted the Amendment since AFI continued to use the Wells Fargo account services after 30 days' notice of the Amendment.  (*Id.* ¶ 14.)  Wells Fargo compares the Amendment Provision of the CDA to a termination provision.  (*Id.* ¶¶ 15–17.)  According to Wells Fargo, courts uphold termination provisions in contracts that include the same 30 day notice provision, regardless whether the exercise of the provision makes the contract onerous or whether the power is exercised in good faith.  (*Id.* ¶ 16 (citing *Bushwick-Decatur Motors, Inc. v. Ford Motor Co.*, 116 F.2d 675, 677 (2d Cir. 1940) (applying Michigan law); *Joseph Victory Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F. Supp. 347, 353 (S.D.N.Y. 1996); *Alco Standard Corp. v. Schmid Bros., Inc.*, 647 F. Supp. 4, 7 (S.D.N.Y. 1986)).)  Wells Fargo advocates for a similar treatment of the Amendment Provision and also contends that AFI's position is hollowed by the fact that the parties are sophisticated and specifically agreed to completely terminate the agreement on thirty days' notice or amend

the agreement upon the same notice subject to the Depositor's right to discontinue service.  (*Id.* ¶¶ 17–20, 24.)  Wells Fargo also asserts that at least one other court has upheld a similar amendment provision.  (*Id.* ¶ 24.)  Wells Fargo further argues that this issue of contract interpretation is appropriately resolved as a matter of law on a motion to dismiss where, as here, the contract is clear and unambiguous—Wells Fargo acted within its right under the CDA to amend the contract.  (*Id.* ¶¶ 21–22.)  As a result, Wells Fargo argues that the contract, conversion, and declaratory judgment claims cannot survive the Motion to dismiss.  (*Id.* ¶ 25.)

Wells Fargo additionally argues that AFI cannot use the implied covenant of good faith and fair dealing to override the express terms of the CDA.  (*Id.* ¶¶ 26–30.)  Wells Fargo asserts that courts interpret and enforce the plain meaning of contracts and the fact that literal enforcement of a contract term may lead to a mismatch between the parties' expectations or an "unreasonable" exercise of the contracted for powers does not allow the courts to rewrite the plain terms of a contract under the guise of the implied covenant.  (*Id.* ¶¶ 27–29 (citing *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990); *MJ Partners Rest. Ltd. P'ship v. Zadikoff*, 995 F. Supp. 929, 933 (N.D. Ill. 1998); *Gen. Aviation Inc. v. Cessna Aircraft Co.*, 703 F. Supp. 637, 644 (W.D. Mich. 1988), *aff'd* 915 F.2d 1038 (6th Cir. 1990)).)  Wells Fargo argues that the CDA clearly sets forth Wells Fargo's ability to amend the agreement on 30 days' notice; Wells Fargo's actions therefore cannot constitute a breach of the implied covenant of good faith and faith dealing.  (*Id.* ¶ 30.)

Wells Fargo concludes by asserting that the December 10, 2013 Release Agreement bars AFI from challenging the reasonableness of the actions taken by Wells Fargo pursuant to the Amendment.  (*Id.* ¶¶ 31–37.)  According to Wells Fargo, the December 10, 2013 Release Agreement provided for a partial settlement under which Wells Fargo was released from all

claims that AFI might assert against Wells Fargo, except for a claim that the amendment to the

CDA was invalid.  (*Id.* ¶ 33 (citing *id.* Ex. 1).)  Wells Fargo argues that the reasonableness of the

W&S fees is beyond argument and cannot be litigated before the Court.  (*Id.* ¶ 35.)  Wells Fargo

contends that the December 10, 2013 Release Agreement is unambiguous and must be enforced

according to its terms.  (*Id.* ¶ 36.)  Wells Fargo therefore asserts that any claim AFI asserts that

the attorney's fees were unreasonable and should not have been deducted even if the Amendment

were valid, must be dismissed.  (*Id.* ¶ 37.)

### H.    The Opposition

AFI first argues that the Amendment is void under New York law because it violates the

Statute of Frauds codified in New York General Obligations Law ("NYGOL") section 5-701(a).

(Opp. at 7–10.)  AFI asserts that the Amendment is a special promise to answer for a debt of

another and is not capable of being performed within a year; although the Amendment is in

writing in the letter, AFI never executed the letter, and the Amendment is therefore

unenforceable.  (*Id.*)  AFI similarly asserts that the Amendment violates NYGOL section 5-1103,

which governs the modification of a security interest provision and requires that the party against

whom it is sought to be enforced sign the written modification.  (*Id.* at 10–11.)  Since AFI did

not sign the letter contemplating the Amendment, AFI contends that the Amendment is invalid

under this New York statute.  (*Id.*)

AFI further asserts that, contrary to Wells Fargo's assertions, the Amendment constitutes

a breach of the implied covenant of good faith and fair dealing.  (*Id.* at 11–15.)  AFI argues that

the Amendment Provision in the CDA is a discretionary provision that should be read to

encompass the implied covenant of good faith and fair dealing and should also be interpreted

narrowly, such that only terms that already existed in the agreement can be amended and new

terms on extraneous subject matter cannot be added. (*Id.* at 11–12.) AFI contends that to find

otherwise would allow Wells Fargo to use the amendment process arbitrarily and to impose

terms that were never contemplated by the consent that the depositor gave upon signing the

CDA. (*Id.* at 12.) Moreover, AFI argues that such a broad reading of the Amendment Provision

would place AFI "at the mercy of" Wells Fargo's whims to impose whatever terms Wells Fargo

wants, which would be "against the general policy of the law." (*Id.* at 12–13 (quoting *Fair*

*Pavilions, Inc. v. First Nat'l City Bank*, 19 N.Y.2d 512, 518 (1967)).)

   The fact that AFI never affirmatively agreed to the Amendment should alone defeat its

validity and effect. (*Id.* at 13 (citing *Discover Bank v. Shea*, 827 A.2d 358, 364–65 (N.J. Super.

2001); *Badie v. Bank of Am.*, 79 Cal Rptr. 2d 273, 290 (Ct. App. 1998)).) According to AFI,

Wells Fargo's argument that AFI's failure to close all of its accounts during the 37 day period

constitutes consent is without merit because such closure in such a short amount of time was not

a viable option for AFI. (*Id.* at 13–14.) AFI argues that the 37 day period was grossly

inadequate, demonstrating that (1) the extreme nature of Wells Fargo's alleged Amendment was

not mutually contemplated by the parties as being within the Amendment Provision when the

parties signed the CDA approximately two months before receiving the Amendment, and (2)

Wells Fargo did not act in good faith or deal fairly with AFI with respect to the Amendment.

(*Id.* at 14.)

   AFI further argues that the Amendment is commercially unreasonable, renders the CDA

illusory, and is unconscionable. (*Id.* at 15–24.) First, AFI argues that the Amendment is

commercially unreasonable and unenforceable because the Amendment sets forth entirely new

obligations not contemplated originally by the parties, unilaterally gives Wells Fargo a security

interest in all AFI property in breach of covenants AFI owes to others, and was clearly outside

the scope of the Amendment Provision.  (*Id.*)  Second, AFI argues that if the Amendment

Provision permits Wells Fargo to make such unfettered changes to the CDA, courts have held

that such provisions for unilateral amendment renders a contract illusory.  (*Id.* at 19 (citing *Sears*

*Roebuck & Co. v. Avery*, 593 S.E.2d 424, 432 (N.C. 2004); *Badie*, 79 Cal. Rptr. 2d at 284–85).)

Third, AFI asserts that a contractual notice period must be reasonable to be effective; the notice

provision in the Amendment Provision was misused by Wells Fargo and unreasonable, and as

such does not effectively provide AFI's consent to the Amendment.  (*Id.* at 20–1.)  Fourth, AFI

contends that the Amendment is unconscionable.  (*Id.* at 21–24.)  AFI argues that Wells Fargo

anticipated the Debtors' bankruptcy and immediately attempted to shift the burden for any

expense Wells Fargo might incur as a result upon AFI.  (*Id.* at 21.)  Substantively, AFI argues

that the Amendment is unconscionable because the terms of the Amendment are unreasonably

favorable to Wells Fargo.  (*Id.* at 22–23.)  Moreover, AFI asserts that the Amendment is

procedurally unconscionable because AFI did not have "any ability to bargain for the terms," or

an "opportunity to engage in that process."  (*Id.* at 24.)

AFI acknowledges that the December 10, 2013 Release Agreement prevents AFI from

taking discovery concerning the reasonableness of W&S's fees without the Court's permission.

However, AFI states if the Complaint survives it will seek discovery on Wells Fargo's

motivation for making the Amendment in connection with the breach of the covenant of good

faith and fair dealing and the unreasonable nature of the Amendment, as well as whether the

CDA was breached because some part of the charged fees had no connection with the Debtors'

accounts.  (*Id.* at 21–22 n*.)

## I.    The Reply

Wells Fargo argues that AFI's failure to plead the Statute of Frauds and other NYGOL

defenses in the Complaint precludes their assertion in the Opposition.  (*Id.* ¶¶ 5–6 (citing *Ryan v.*

*Kellogg Partners Inst. Servs.*, Index No. 601909/05, 2010 N.Y. Slip. Op. 33771 [U], at *8–10

(N.Y. Sup. Ct. Jan. 8, 2010); *23/23 Commc'ns Corp. v. GMC*, 257 A.D.2d 367, 367 (N.Y. App.

Div. 1999)).)  In any event, Wells Fargo argues that the Statue of Frauds and other NYGOL

defenses have no application in this case because the parties entered into a signed agreement that

expressly provides for the way in which amendments to that agreement will be evidenced.  (*Id.*

¶¶ 7–5.)  Further, the Statute of Frauds may be satisfied through a combination of writings, only

one of which need be signed while others need not be signed.  (*Id.* ¶ 12.)  Wells Fargo also

asserts that AFI's defense that the Amendment was made without consideration is unpersuasive

because where the original contract allows one party to change the terms pursuant to

ascertainable standards, an amendment does not require additional consideration.  (*Id.* ¶ 13.)

Wells Fargo asserts that AFI fails to point to a single case on point that involves a contract with

an express change of terms provision.  (*Id.* ¶ 14.)

Wells Fargo also reiterates its argument that AFI cannot use the implied covenant of good

faith and fair dealing to override the express terms of the CDA.  (*Id.* ¶¶ 15–22.)  Wells Fargo

relies on *Valle v. ATM National, LLC*, No. 14-cv-7993 (KBF), 2015 WL 413449, at *5

(S.D.N.Y. Jan. 30. 2015), which holds that a customer accepts the revised terms of its account

agreement, whether the terms were originally contemplated or not, by continuing to use such

accounts after receiving notice of the revised terms.  (*Id.* ¶¶ 15–17.)  According to Wells Fargo,

AFI's continued use of the accounts past the notice period constituted more than mere passive

use and therefore manifested acceptance of the Amendment.  (*Id.*)  Wells Fargo further asserts

that this acceptance makes it irrelevant whether the Amendment was within the reasonable

contemplation of the parties.  (*Id.* ¶ 18.)  Wells Fargo also asserts that even if the question of

reasonable expectations were relevant, the CDA did contemplate reimbursement and

indemnification.  (*Id.* ¶ 20 (citing CDA at 8 § 21; *id.* at 17; *id.* Ex. B at 3–8).)  Wells Fargo

contends that the expansion of the indemnification and reimbursement obligations to encompass

the obligations of AFI's co-signatories was also within reasonable expectations because AFI and

all of the AFI affiliates had the same signatory to the CDA, which contained a broad

indemnification and reimbursement obligation for losses related to the accounts.  (*Id.* ¶ 21.)

Wells Fargo further argues that the Amendment was neither procedurally nor

substantively unconscionable.  (*Id.* ¶¶ 23–27.)  First, the Amendment was not procedurally

unconscionable because AFI received notice of the Amendment (and received seven extra days).

(*Id.* ¶¶ 24–25.)  According to Wells Fargo, AFI's attempt to argue that the 30 day notice period

was insufficient is a belated attempt to re-negotiate the change of terms provision in the contract.

(*Id.* ¶ 25.)  Wells Fargo submits that this should end the inquiry; in order to prove

unconscionability without procedural unconscionability, the plaintiff must show that the contract

provision at issue is so outrageous that it falls within the very limited number of "exceptional

cases" that warrant holding the provision unenforceable solely on the ground of substantive

unconscionability, which AFI cannot prove here.  (*Id.* ¶ 26.)  Wells Fargo argues that AFI cannot

argue the Amendment was substantively unconscionable because parent companies routinely

indemnify and guarantee their subsidiaries' obligations and subordinate their claims.  (*Id.* ¶ 27.)

Wells Fargo concludes by asserting that AFI has not refuted the fact that the December

10, 2013 Release Agreement precludes its claims challenging the reasonableness of the

attorneys' fees and requires dismissal of such claims.  (*Id.* ¶ 28.)

19

## II.    DISCUSSION

### A.    Standard on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure ("FRCP"), made applicable here by Rule 7012 of the Federal Rules of Bankruptcy

Procedure, a complaint need only allege "enough facts to state a claim for relief that is plausible

on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation

marks omitted).  Plausibility "is not akin to a probability requirement," but rather requires "more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal

quotation marks omitted).

Courts use a two-prong approach when considering a motion to dismiss. *Pension Benefit*

*Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that motion

to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working principles'"

(quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v. Citibank, N.A. (In re The 1031 Tax Grp., LLC)*,

420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009).  First, the court must accept all factual

allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *See,*

*e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir.

2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in

the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)).  Second, the court must determine if

these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679

(citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). A complaint that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

On a motion to dismiss, in addition to the complaint, a court may consider written instruments, such as a contract, that is either attached to the complaint or incorporated by reference. *See, e.g.*, FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *In re Lois/USA, Inc.*, 264 B.R. 69, 89 (Bankr. S.D.N.Y. 2001) ("In addition to the complaint itself, a court may consider, on a motion to dismiss, the contents of any documents attached to the complaint or incorporated by reference . . . ."). Courts may also take judicial notice of settlement agreements in order to determine whether claims are barred by a previous settlement. *See, e.g.*, *Rolon v. Henneman*, 389 F. Supp. 2d 517, 519 (S.D.N.Y. 2005); *see also Johns v. Town of E. Hampton*, 942 F. Supp. 99, 104 (E.D.N.Y. 1996) ("[W]hen a [party] fails to introduce a pertinent document as part of his pleading, [the other party] may introduce the exhibit as part of his motion attacking the

pleading." (quoting CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE: CIVIL 2D § 1327, at 762–63 (2d ed. 1990)) (internal quotation marks omitted)).

### B.    Breach of Contract, Conversion, and AFI's Request for Declaratory Relief

The dismissal of AFI's breach of contract and conversion claims and its request for

declaratory relief turns on whether the Complaint sufficiently alleges that Wells Fargo breached

and/or acted beyond the express terms of the CDA.  The Complaint alleges two breaches:  (1)

Wells Fargo breached the CDA by enacting the Amendment; and (2) Wells Fargo breached the

CDA by debiting funds from the AFI Funding Account.  The first theory of breach relies on the

invalidity of the Amendment Provision of the CDA, rendering unenforceable Wells Fargo's act

of unilaterally amending the CDA upon 37 days' notice.  Alternatively, if the Amendment

Provision is valid and enforceable, the first theory relies on the allegation that Wells Fargo acted

beyond the terms of the Amendment Provision in enacting the Amendment because terms were

added that were not contemplated in the parties' original CDA.  The second theory relies on the

purported unconscionability of the Amendment, resulting in the original CDA being the only

enforceable agreement governing the parties' contractual relationship; Wells Fargo's actions

debiting the funds in the account to pay legal fees would then be in breach of that agreement.

The Court addresses each of AFI's theories of breach in turn below and concludes that

AFI fails to sufficiently allege that Wells Fargo breached the CDA under either of its two

theories.  As such, the Motion is **GRANTED** to the extent it seeks dismissal of the breach of

contract and conversion claims and AFI's request for declaratory relief.

### 1.    *Wells Fargo Did Not Breach the CDA by Enacting the Amendment*

"Under New York law, which governs this contract, 'the initial interpretation of a

contract is a matter of law for the court to decide.'"  *Compania Financiera Ecuatoriana de*

*Desarollo, S.A. v. Chase Manhattan Bank*, No. 97 Civ. 5724 (JGK), 1998 WL 74299, at *3

(S.D.N.Y. Feb. 19, 1998) (quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632,

637 (2d Cir. 1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.

1996)) (citing *Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990); *Metro. Life*

*Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).  On a motion to dismiss where

the terms of the contract are brought into question, the court is "'not constrained to accept the

allegations of the complaint in respect of the construction of the [a]greement,' although all

contractual ambiguities must be resolved in the plaintiff's favor."  *Id.* at *1 (quoting *Int'l*

*Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  A contract must

be "construed in accordance with the parties' intent as evidenced by [its] written terms."  *Filho v.*

*Safra Nat'l Bank of N.Y.*, 797 F. Supp. 2d 289 (S.D.N.Y. 2011), *rev'd in part*, 489 F. App'x 483

(2d Cir. 2012) (finding that a disputed issue of fact regarding whether the defendant followed the

notice provision in the change of terms provision of the relevant contract precluded dismissal of

breach of contract claim).  If the terms of the contract are "'complete, clear and unambiguous on

[their] face, [they] must be enforced according to the plain meaning of [their] terms,' and a

breach of contract claim may be dismissed on a [FRCP] 12(b)(6) motion."  *Wurtsbaugh v. Banc*

*of Am. Secs. LLC*, No. 05 CIV. 6220(DLC), 2006 WL 1683416, at *5 (S.D.N.Y. 2006).  Such a

contract "'has "a definite and precise meaning, unattended by danger of misconception in the

purport of the [contract] itself, and concerning which there is no reasonable basis for a difference

of opinion."'"  *Compania Financiera de Desarollo*, 1998 WL 74299, at *3 (quoting *Sayers v.*

*Rochester Tel. Corp. Supplemental Mgmt. Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting

*Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)) (citing *United Nat'l Inc. Co. v.*

*Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 109 (2d Cir. 1993); *Metro. Life Ins. Co.*, 906 F.2d at

889).

By contrast, when a provision of a contract is "material to the breach of contract claim" and is ambiguous, a FRCP 12(b)(6) motion will fail. *Wurtsbaugh*, 2006 WL 1683416 at *5 (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)). "'Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (quoting *Eternity Global Master Fund Ltd.*, 375 F.3d at 178 (citation omitted)); *see also Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)*, 374 B.R. 113, 120 (Bankr. S.D.N.Y. 2007). To determine whether a contract provision is ambiguous, the court must "'consider the entire contract to "safeguard against adopting an interpretation that would render any individual provision superfluous."'" *In re Musicland*, 374 B.R. at 120 (quoting *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (quoting *Sayers*, 7 F.3d at 1095)) (citing *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992 ) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988); *Bailey v. Fish & Neave*, 837 N.Y.S.2d 600, 603 (2007))). Only where the contract provision is ambiguous may the court consider extrinsic evidence of the parties' intent, if available. *See id.*; s*ee also Compania Financiera de Desarrollo*, 1998 WL 74299, at *3.

Here, AFI attempts to suggest that there is an ambiguity in the Amendment Provision such that Wells Fargo's arguments rely on an interpretation that the Amendment Provision gives Wells Fargo an unfettered unilateral right to amend the contract, while AFI reads the provision to mean that Wells Fargo may only amend the CDA by changing or adding terms that were contemplated in the original agreement. Wells Fargo's arguments, however, do not entirely rely

on the broader interpretation that AFI suggests.[2]  Moreover, the Amendment Provision does not,

by its terms, lend itself to the broader interpretation.  First, the Amendment Provision includes

express limitations to Wells Fargo's unilateral right to amend; that is, Wells Fargo may only

amend the CDA if it provides at least 30 days' notice to AFI and the opportunity to close its

accounts within the notice period should AFI seek to reject the amendment.[3]  (*See* CDA at 1.)

Second, the Amendment Provision should also be read, as other similarly broad change of terms

provisions, to include the implied limitation that Wells Fargo may only exercise its unilateral

right to amend the terms of the agreement to the extent that the amended terms were

contemplated in or germane to the original agreement.  *See Filho*, 797 F. Supp. 2d at 296 ("The

[contract] includes a broadly worded 'change of terms' clause in which Defendant reserves the

right 'to change these Terms and Conditions.'  By its own terms, the contract's 'change of terms'

clause only allows Defendant to impose changes to these Terms and Conditions, meaning those

pre-existing provisions in the [contract]."); *In re Musicland*, 374 B.R. at 121 ("Thus, the

provisions of the [contract] were sufficiently broad on their face to encompass the incorporation

of the [loan with a different term lender], and to allow the parties to amend or supplement the

existing definitions and other terms of the Revolving Credit Agreement to accomplish that

end."); *see also Sears Roebuck & Co.*, 593 S.E.2d at 434 ("We hold that the parties did not

intend that the 'Change of Terms' provision in the original agreement would allow Sears to

---

[2]      Wells Fargo's argument with respect to the validity of the Amendment Provision is two-fold.  First, Wells
Fargo asserts that under New York law, a change of terms provision that provides an unfettered right to amend is
valid and enforceable so long as the amending party provided the requisite notice of the amendment and provided
the other party the opportunity to opt-out.  Second, Wells Fargo argues that even if the Amendment Provision must
be read as AFI suggests, the Amendment Provision is clear and unambiguous and Wells Fargo acted in accordance
with such terms by enacting an Amendment relating directly to pre-existing terms of the CDA and giving AFI the
requisite notice and opportunity to close its accounts to opt-out.

[3]      While these express limitations may be sufficient to validate the Amendment Provision under *Valle*, 2015
WL 413449, at *5, as Wells Fargo suggests, the Court need not reach this specific issue at this time.

unilaterally add completely new terms that were outside the universe of the subjects addressed in the original cardholder agreement."). The Court therefore concludes that the Amendment Provision is clear and unambiguous.

The Court also concludes that the Amendment Provision is valid and enforceable, contrary to AFI's assertions. First, AFI fails to demonstrate that the Amendment Provision is illusory due to its breadth. While the power to unilaterally amend contractual provisions without limitations could give rise to an illusory contract, *see Sears Roebuck & Co.*, 593 S.E.2d at 432, courts will "examine the reasonableness of a defendant's behavior before holding a contract to be illusory," *see Valle*, 2015 WL 413449, at *5, or read the provision to include an implied limitation, *see Bassett v. Elec. Arts, Inc.*, No. 13-CV-4208 (MKB), ---F. Supp. 3d ---, 2015 WL 1298632, at *8 (E.D.N.Y. Mar. 23, 2015) ("The Court agrees with Judge Gold's conclusion that the arbitration provision was not invalid as illusory simply because [the defendant] had the unilateral right to modify the agreement. Under New York and California law, the fact that one party to an arbitration agreement has the unilateral right to modify that agreement does not automatically render the agreement illusory, as 'the discretionary power to modify or terminate an agreement carries with it the duty to exercise that power in good faith and fairly.'" (quoting *John v. Hanlees Davis, Inc.*, No. 12-CV-2529, 2013 WL 3458183, at *6 (E.D. Cal. July 9, 2013 (applying *24 Hour Fitness, Inc. v. Super. Ct.*, 78 Cal. Rptr. 2d 533, 541–42 (Ct. App. 1998))) (citing *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 84–85 (2d Cir. 2013); *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *Dalton*, 87 N.Y.2d at 389); *Serpa v. Cal. Sur. Investigations, Inc.*, 155 Cal. Rptr. 3d 506, 514 (Ct. App. 2013)). As indicated above, the Amendment Provision is clear and unambiguous and includes both express and implied

limitations upon Wells Fargo's unilateral right to amend the CDA.  Accordingly, the
Amendment Provision is not illusory.

Second, AFI fails to show that the 30 day notice period in the Amendment Provision is
unconscionable, commercially unreasonable, and/or impracticable.  In terms of
unconscionability, AFI fails to rebut the presumption of conscionability in the CDA because both
Wells Fargo and AFI are sophisticated business entities that had equal bargaining power at the
time the CDA was negotiated, agreed upon, and executed.  *See Am. Dredging Co. v. Plaza
Petroleum Inc.*, 799 F. Supp. 1335, 1339 (E.D.N.Y. 1992) ("When the contract is between two
commercial entities, unconscionability must be viewed 'in light of the general commercial
background and the commercial needs of the particular trade or case,' and there is a presumption
of conscionability when the contract is between business in a commercial setting.  Courts have
rarely found a clause to be unconscionable in a commercial contract.").  Moreover, the cases
upon which AFI relies are inapposite because:  (1) they involve adhesion contracts, which
inherently involve unequal bargaining power, (2) notice and time to opt-out was not properly
afforded to the plaintiff(s),[4] (3) other states' law was applied, and (3) each involved the addition
of an arbitration provision waiving the constitutional right to a jury trial to a contract that did not
discuss dispute resolution.  *See, e.g.*, *Badie*, 79 Cal Rptr. 2d at 280–81 (Ct. App. 1998) (applying
California law); *Follman v. World Fin. Network Nat'l Bank*, 721 F. Supp. 2d 158, 161–66
(E.D.N.Y. 2010) (applying Ohio law); *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d
189, 196–98 (E.D.N.Y. 2004) (applying Virginia law); *Shea*, 827 A.2d at 362–65 (applying New
Jersey and California law); *Sears Roebuck & Co.*, 593 S.E.2d at 426–34 (applying Arizona law).

---

[4]     At least one court, applying New York law to a case involving a unilaterally amended contract in which
new terms were added that were not germane to the original contract, has held that the same cases AFI cites in its
Opposition were inapplicable because the amending party provided the other party notice and an opportunity to opt-
out—procedural terms that are expressly provided in the Amendment Provision and were followed by Wells Fargo.
*See Valle*, 2015 WL 41344, at *4–6.

As to AFI's argument that the 30 day notice period is commercially unreasonable and impracticable because AFI could not have closed all of its accounts within that time period, the Court is unpersuaded.  AFI cannot now renegotiate the terms of the contract for which it bargained simply because things did not turn out favorably for it.  *See Indus. Representatives, Inc. v. CP Clare Corp.*, 74 F.3d 128, 130 (7th Cir. 1996) ("The terms on which the parties would part ways were handled expressly in this contract, and IRI got what it bargained for.  Contracts allocate risks and opportunities.  If things turn out well, the party to whom the contract allocates the upper trail of outcomes is entitled to reap the benefits.").  Nor can AFI convince the Court "to rewrite the contract to fulfill [its] unspoken expectation" that Wells Fargo would give AFI more time to close its accounts or would not amend the CDA in the way that it did.  *In re Musicland*, 374 B.R. at 121.  If AFI wanted more time to close its accounts in order to timely reject a future amendment of the CDA, AFI should have negotiated for more time before it executed the CDA.

Having found that the Amendment Provision is clear, unambiguous, valid, and enforceable, the Court must now examine whether Wells Fargo acted in accordance with the terms of the Amendment Provision when it enacted the Amendment.  Procedurally, Wells Fargo clearly acted within the terms of the Amendment Provision.  Wells Fargo provided 37 days' notice (even though it was only required to provide 30 days' notice) to AFI of the Amendment before it went into effect and advised AFI that it had 37 days to close its accounts if it sought to reject the amended terms.  AFI thereafter failed to close all of its accounts within the 37 days and was deemed to have accepted the changes to the CDA.  Substantively, Wells Fargo also acted within the terms of the Amendment Provision by only adding or changing terms that were germane to the original CDA.  AFI points to the indemnity, guarantee, and security interest provisions of the Amendment, arguing that the parties never contemplated AFI's guarantee of

28

any of the other Depositor's obligations to Wells Fargo.[5]  The Court disagrees.  The CDA

includes the Indemnification Provision and Setoff Provision discussing the parties' obligations to

one another, including the Depositor's obligation to indemnify Wells Fargo, Wells Fargo's

ability to set off such obligations by drawing from the accounts, Wells Fargo's ability to obtain a

security interest in the funds in the accounts, and the Depositor's potential liability as a

guarantor.  (*See* CDA § 16; *id.* at 17.)  The Amendment then expressly refers back to these

provisions in adding the very language AFI argues was never contemplated.  (*See generally*

Amendment.)

      AFI unpersuasively emphasizes the fact that AFI is held liable as the guarantor for the

other Depositors' obligations under the Amendment.  In doing so, AFI highlights the Defining

Terms Provision, which refers to each Depositor as "you," in connection with the references to

"you" in the Indemnification and Setoff Provisions (and elsewhere in the CDA).  According to

AFI, as a result of these singular or individual Depositor references, it is completely outside the

parties' expectations to group the Depositors together in some way under the CDA's terms; or

more specifically, to hold one Depositor accountable for the liabilities of another Depositor.

This interpretation, however, conflicts with the nature of the CDA and the conduct of AFI and

the other Depositors in negotiating and executing the CDA.  "You," in this context, can just as

easily refer to the plural as well as the singular.  Each of the Depositors signed the same CDA

---

[5]       In the Opposition, AFI asserts that the Amendment grants Wells Fargo a security interest in AFI's assets
held worldwide.  At the Hearing on the Motion, however, AFI was not able to point to any provision in the
Amendment that provided for such a security interest; nor does the Court read the Amendment to provide such a
broad security interest.  Instead, the security interest provision of the Amendment appears to be almost exactly the
same as that granted in the CDA—the collateral is limited to the funds in the Depositors' accounts with Wells Fargo.
*Compare* CDA at 17 ("By accepting services, you also grant us a consensual security interest in your accounts and
to the funds held in them as collateral to secure your present and future obligations."), *with* Compl. Ex. B ("Your
obligations and our right to set off expressly include any obligation sowed to us for services provided pursuant to
this agreement, whether provided to you or any direct or indirect subsidiary of yours; you further agree that we have
the right to deduct setoff amounts that any of your subsidiaries owe us from any accounts that you hold with us, and
*you also grant us a consensual security interest I your accounts and to the funds held in them as collateral to secure
your present and future obligations to us, and your subsidiaries' present and future obligations to us under this
agreement*." (emphasis added)).

agreement on three signature pages; each of the entities has the same exact signatory that signed

the CDA; each of the entities to which the CDA applies is listed in Exhibit A to the CDA;[6] each

of the Depositors received the benefits of Wells Fargo's services pursuant to the CDA in opening

one or more accounts with Wells Fargo; and each of the Depositors are bound by the obligations

of a Depositor defined as "you" in the CDA.  (*See* CDA at 23-25; *id.* Ex. A.)  That the CDA

governed all of the entities by the same terms by referring to each individually does not

necessarily preclude Wells Fargo from amending the agreement to have one of those entities

(here the parent) held liable for the obligations of another.  Indeed, the Setoff Provision of the

CDA expressly contemplates the possibility that a Depositor may be a guarantor:  "If you ever

owe us money as a customer, borrower, *guarantor* or otherwise including any obligation owed to

us for services provided pursuant to this agreement . . . ."  (*Id.* at 17 (emphasis added).)  AFI's

argument is therefore a non-starter—a Depositor in these circumstances cannot be a guarantor of

its own account.

In sum, the Court finds and concludes that the Amendment Provision is clear,

unambiguous, valid, and enforceable.  The Court further finds that Wells Fargo, by enacting the

Amendment, acted within the terms of the Amendment Provision.  As a matter of law, the Court

concludes that AFI fails to establish that AFI breached or acted outside the terms of the CDA.

Consequently, AFI's breach of contract and conversion claims and its request for declaratory

relief, each of which inherently relies on Wells Fargo's breach or conduct beyond the express

terms of the CDA, are insufficiently pled under this theory of breach.  Wells Fargo's Motion in

this regard is **GRANTED** and AFI's breach of contract and conversion claims, in addition to its

---

[6]     The Defining Terms provision also provides that all of the documents (i.e. including Exhibit A to the CDA) constitute the "agreement."  (*See* CDA at 1.)

request for declaratory relief, are **DISMISSED** to the extent they are based on this theory of breach.

> 2.    *Wells Fargo's Actions Pursuant to the Amendment Did Not Constitute a Breach of the CDA Because the Amendment Is Valid and Enforceable*

In support of AFI's second theory of breach, AFI asserts that the Amendment itself is invalid because it violates the Statute of Frauds and other provisions of the NYGOL and is unconscionable.  AFI further asserts that since the Amendment is invalid, by withdrawing funds from AFI's account pursuant to the terms of the Amendment, Wells Fargo breached the CDA, which did not provide such a right to Wells Fargo.  By contrast, Wells Fargo argues that the Amendment is valid and enforceable because it falls outside the Statute of Frauds and the asserted NYGOL provisions and AFI fails to rebut the presumption of conscionability in the Amendment.

As set forth below, the Motion to dismiss is **GRANTED** to the extent it seeks dismissal of the breach of contract and conversion claims and the request for declaratory relief based on this theory of breach.[7]  The Statute of Frauds and NYGOL are inapplicable in this instance and AFI fails to sufficiently allege unconscionability.

---

[7]    As indicated above, AFI's conversion claim alleges that Wells Fargo acted beyond the express terms of the CDA when it debited funds from the AFI Funding Account.  Under New York law, "[a] conversion takes place when someone, intentionally and *without authority*, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50 (2006) (citing *New York v. Seventh Regiment Fund*, 98 N.Y.2d 249 (2002)) (emphasis added).  The Complaint rests the conversion claim on the allegation that Wells Fargo lacked authority to debit the funds from the AFI Funding Account pursuant to the terms of the CDA; in other words, AFI's conversion claim depends upon a finding that Wells Fargo breached the CDA.  In addition to the Complaint's failure to sufficiently allege that Wells Fargo breached the CDA under either of the two theories of breach, the conversion claim is **DISMISSED** because it is "predicated on a mere breach of contract."  *See Hui Qun Zhao v. Yu Qi Wang*, 558 F. App'x 41, 43 (2d Cir. 2014) ("Because [the conversion] claim turn entirely on the issue of breach, it sounds in contract, not conversion." (citing *MBL Life Assurance Corp. v. 555 Realty Co.*, 240 A.D.2d 375, 376–77 (N.Y. App. Div. 1997) ("It is settled, however, that a claim of conversion cannot be predicated on a mere breach of contract.  Because the plaintiff failed to submit evidence demonstrating a wrong independent from the contract claim, the defendants are entitled to dismissal of the third cause of action to recover damages for conversion." (citations omitted))); *see also Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 158 (2d Cir. 2012) ("[A] claim to recover damages for conversion cannot be predicated on a mere breach of contract.  Since the appellant's conversion claim

a)    The Statute of Frauds and Other Asserted Provisions of the
NYGOL Are Inapplicable

AFI's first attempt at establishing the invalidity of the Amendment relies on the New

York Statute of Frauds and certain other provisions of the NYGOL.  According to AFI, the

Amendment contemplates a guarantee obligation and is unable to be performed within one year.

In order to avoid violation of the Statute of Frauds codified in NYGOL sections 5-701(a)(1) and

(a)(2), such an agreement must be in writing and signed by the party against whom enforcement

is sought (here AFI).  AFI similarly argues that the Amendment violates NY GOL section

5-1103, which requires that modifications to a contract relating to security interests be in writing

and contemplate separate consideration in support of the modification.  *See* N.Y. GEN. OBLIG.

LAW § 5-1103.  According to AFI, no additional consideration was provided in exchange for the

amended terms.

Putting aside the fact that not one of these statutory arguments was raised in AFI's

Complaint, these arguments are misguided.  AFI ignores that the parties had a written agreement

to begin with that included the Amendment Provision, expressly providing Wells Fargo with the

right to amend its terms.  *See Alken Indus., Inc. v. Toxey Leonard & Assocs., Inc.*, Index No.

17304-11, 2013 NY Slip Op. 31864(U) (N.Y. Sup. Ct. Aug. 2, 2013) ("The defendant's

arguments in support of General Obligations Law section 5-701(a)(1) ignore the fact that the

parties had a written agreement.  The written agreement continued to govern the parties'

relationship even after the purported modification.  In fact, when Alken terminated the

agreement in 2009, it gave Leonard 30 days' written notice in accordance with the written

agreement.  Accordingly, General Obligations Law section 5-701(a)(1) does not apply."); *Filho*,

797 F. Supp. 2d at 297 ("First, he argues that the 2005 change was a contract modification

---

does not stem from a wrong which is independent of the alleged breach of [contract], it was properly dismissed."
(quoting *Wolf v. Nat'l Council of Young Israel*, 264 A.D.2d 416, 417 (N.Y. App. Div. 1999) (citations omitted))).

requiring separate consideration under New York law. [citing N.Y. GEN. OBLIG. LAW § 5-1103.] This argument completely ignores the 'change of terms' clause in the IBTC. Indeed, as the Court has found that the contractual change was properly implemented through an agreed-upon 'change of terms' provision, it is not a contract modification as contemplated by New York's General Obligations Law at all."). Moreover, the Statute of Frauds may be satisfied through a combination of writings, only one of which need be signed by the party against whom enforcement of the contractual relationship is sought. *See 23/23 Commc'ns Corp.*, 257 A.D.2d at 367 ("[T]he various writings [only one of which was executed by the party against whom enforcement is sought] can be pieced together to establish a single contractual relationship."); *Anatares Mgmt. LLC v. Galt Global Capital, Inc.*, No. 12-CV-6075(TPG), 2013 WL 1209799, at *10 (S.D.N.Y. Mar. 22, 2013) ("A sufficient writing under the statute of frauds may be established by a combination of signed and unsigned documents, letters or other writings provided at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged (or his authorized agent), while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed." (citation and internal quotation marks omitted)); *see also Elias v. Serota*, 103 A.D.2d 410, 415 (N.Y. App. Div. 1984) ("While the Statute of Frauds requires that certain types of contracts be evidenced by a writing [citing N.Y. GEN. OBLIG. LAW § 5-703] it does not require that each stage of the future performance provided in a contract be supported by additional signed writings that memorialize the performance.").

Here, the CDA was executed by AFI and the other Depositors, the CDA provided Wells Fargo with the unilateral right to amend the CDA, the Amendment was an exercise of that right, and the Amendment is therefore not void under the Statute of Frauds or NY GOL section 5-1103

for want of consideration.  To the extent AFI's allegation that the Amendment is invalid and

unenforceable relies on these statutory provisions, the Motion to dismiss is **GRANTED**.

b)   <u>The Amendment Is Not Unconscionable</u>

AFI further argues that the Amendment is invalid and unenforceable because it is

commercially unreasonable and unconscionable.  Under New York law, an unconscionable

contract "is so grossly unreasonable or unconscionable in the light of the mores and business

practices of the time and place as to be unenforceable according to its literal terms."  *Gillman v.*

*Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) (citation and internal quotation marks

omitted).  A finding of unconscionability as to a term or provision of a contract may not

necessarily render the entire contract void; rather, a court may hold that only that unconscionable

term or provision is void and unenforceable.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 208

(1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court

may refuse to enforce the contract, or may enforce the remainder of the contract without the

unconscionable term, or may so limit the application of any unconscionable term as to avoid any

unconscionable result.").

To prove that a contract is unconscionable, a party must meet two prongs:  procedural

and substantive.  *Gillman*, 73 N.Y.2d at 10.  "The procedural element of unconscionability

requires an examination of the contract formation process and the alleged lack of meaningful

choice."  *Id.* at 11.  Courts examining this element focus on, for example, "the size and

commercial setting of the transaction, whether deceptive or high-pressured tactics were

employed, the use of fine print in the contract, the experience and education of the party claiming

unconscionability, and whether there was a disparity in bargaining power."  *Id.*  The substantive

element requires the court to conduct "an analysis of the substance of the bargain to determine

whether the terms were unreasonably favorable to the party against whom unconscionability is

34

urged." *Id.* at 12.  Findings of unconscionability are usually based upon the satisfaction of both

of these elements; however, in "exceptional cases" courts have found that "a provision of the

contract is so outrageous as to warrant holding it unenforceable on the ground of substantive

unconscionability alone." *Id.*

For contracts entered into by two businesses in a commercial setting, there is a

presumption of conscionability "'in light of the general commercial background and the

commercial needs of the particular trade or case'" and unconscionability is rarely found.  *Am.*

*Dredging Co.*, 799 F. Supp. at 1339 (quoting *Rubin v. Telemet*, 698 F. Supp. 447 (S.D.N.Y.

1988)) (citing *Cayuga Harvester, Inc. v. Allis Chalmers Corp.*, 95 A.D.2d 5 (N.Y. App. Div.

1983)).  However, "each case must be decided on its own facts" and "if it appears from the

record before the court that unconscionability may exist, and the issue is not free from doubt,

then the court must hold a hearing where the parties may present evidence with regard to the

circumstances of the signing of the contract and the disputed terms' setting, purpose and effect."

*New York v. Wolowitz*, 96 A.D.2d 47, 68 (N.Y. App. Div. 1983).

AFI argues that the Amendment is both procedurally and substantively unconscionable.

First, AFI argues that the Amendment is procedurally unconscionable because Wells Fargo

purported to unilaterally amend the CDA such that AFI did not have the ability to bargain for the

terms and had no opportunity to engage in the negotiation process.  (Opp. at 24.)  Second, AFI

asserts that the Amendment is substantively unconscionable because the terms, which impose

without consent or further consideration guarantee and indemnification obligations and a security

interest in AFI's property (purportedly unlimited in scope) to secure the debts of third parties, are

unreasonably favorable to Wells Fargo and potentially cause AFI to breach covenants made to

others.  (*Id.* at 22–23.)

In terms of the procedural element, AFI fails to sufficiently allege that it did not have a "meaningful choice" with respect to the Amendment. While AFI alleges that it was not afforded an opportunity to engage in the negotiation of the terms of the Amendment, AFI cannot allege that it did not engage in the contract formation process before executing the CDA, which includes the Amendment Provision granting Wells Fargo its unilateral right to make the Amendment. Indeed, the Court indicated above that the Amendment Provision was not unconscionable; a finding that an Amendment made pursuant to the procedures prescribed by the Amendment Provision is procedurally unconscionable would be inconsistent. AFI also fails to allege that there were "high-pressured" or "deceptive" practices or any "use of fine print." Wells Fargo followed the procedures for unilaterally amending the CDA that AFI bargained for and bolded and emphasized certain new terms in the Amendment, highlighting the changes made, not hiding them. Lastly, AFI fails to allege that there was a disparity in bargaining power amongst itself and Wells Fargo. Both AFI and Wells Fargo are sophisticated business entities of equal bargaining power. To be sure, contracts between such entities are presumed to be conscionable for that very reason. *See Am. Dredging Co.*, 799 F. Supp. at 1339. AFI's arguments with respect to the procedural aspects of the Amendment's unconscionability hardly rebut this presumption.

In any event, AFI falls even farther short in its argument that the Amendment is substantively unconscionable. Each of the provisions of the Amendment that AFI challenges relate to provisions that were germane to the CDA.[8] AFI cannot use the doctrine of unconscionability as a means to circumvent the effect of the Amendment Provision it bargained for in the CDA. Moreover, even though AFI correctly points out that the Amendment's waiver of AFI's benefit from statutes of limitations is unconscionable and void under New York law,

---

[8] As indicated above, AFI's allegation that the Amendment grants Wells Fargo a security interest in AFI's assets held worldwide is incorrect and unsubstantiated by the terms of the Amendment.

*see Bayridge Air Rights, Inc. v. Blitman Constr. Corp.*, 80 N.Y.2d 777, 779 (1992) (discussing

N.Y. GEN. OBLIG. LAW § 17-103(1)), the invalidity of this one provision in the Amendment does

not render the entire Amendment void, *see* RESTATEMENT (SECOND) ON CONTRACTS § 208.  The

fact that the statutes of limitations remain intact should not affect the other provisions addressing

indemnity, guarantees, and security interests.

Thus, the Court concludes that AFI fails to sufficiently allege that the Amendment is

invalid, unenforceable, or unconscionable.  The Motion to dismiss on this basis is therefore

**GRANTED**.

### C.       Breach of the Implied Covenant of Good Faith and Fair Dealing

AFI's only remaining claim asserted in the Complaint is for Wells Fargo's alleged breach

of the implied covenant of good faith and fair dealing in the CDA.  All contracts governed by

New York law are read to include the implied covenant of good faith and fair dealing in the

course of performance.  *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153

(2002) (citation omitted); *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *see also*

RESTATEMENT (SECOND) ON CONTRACTS § 205 (1981) ("Every contract imposes upon each party

a duty of good faith and fair dealing in its performance and its enforcement").

> This covenant embraces a pledge that neither party shall do
> anything which will have the effect of destroying or injuring the
> right of the other party to receive the fruits of the contract.  While
> the duties of good faith and fair dealing do not imply obligations
> inconsistent with other terms of the contractual relationship, they
> do encompass any promises which a reasonable person in the
> position of the promise would be justified in understanding were
> included.

*511 W. 232nd Owners Corp.*, 98 N.Y.2d at 153 (citations and internal quotation marks omitted);

*see also Dalton*, 87 N.Y.2d at 389 (citations omitted).  A breach of the implied duty of good faith

and fair dealing primarily arises when the contract at issue provides an exercise of discretion;

such a discretionary act must not be exercised "arbitrarily or irrationally." *Dalton*, 87 N.Y.2d at

389; *Citibank, N.A. v. United Subcontractors, Inc.*, 581 F. Supp. 2d 640, 645-46 (S.D.N.Y.

2008). But "[t]he parties' contractual rights and liabilities may not be varied, nor their terms

eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in

good faith." *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 680 (S.D.N.Y. 1991)

(citation omitted).

"Having failed to state a viable claim for breach of the [express terms of the CDA], [AFI]

may not manufacture a breach through invoking the duty of good faith and fair dealing."

*Wurtsbaugh*, 2006 WL 1683416, at *6. The Complaint alleges in pertinent part:

> 29.    Immediately after receiving the Purported Amendment,
> AFI rejected the amendment and initiated the process of closing its
> accounts. AFI made diligent efforts to close all of its accounts with
> Wells Fargo as soon as commercially possible. However, as Wells
> Fargo knew, AFI's accounts were not simple checking accounts
> where funds could be moved promptly to another institution.
> Rather, the Ally Auto Servicing Accounts had issued thousands of
> checks drawn on those accounts that remained unpaid at the time
> of Wells Fargo's Purported Amendment (as an illustration of the
> magnitude of checks, in 2011, approximately 63,000 checks per
> month were drawn on those accounts and issued). AFI could close
> each account after the checks drawn on it had been paid, escheated,
> or reissued. Moreover, as AFI informed Wells Fargo, immediately
> closing those accounts with so many checks outstanding posed a
> serious business risk to AFI in the event those checks were
> returned unpaid or otherwise did not clear because the account had
> been closed.
>
> 30.    In addition, AFI had to establish accounts at a new bank to
> service its auto servicing business, and that, too, Wells Fargo
> knew, would take more than 37 days to accomplish, given the
> complexity of the accounts.
>
> 31.    Finally, the closing of any AFI account required Wells
> Fargo to approve such closure in accordance with its internal
> administrative processes. As such, Wells Fargo controlled the
> timing of the closing of any account upon a request for account
> closure. Wells Fargo was fully aware of the processes required to

> close such accounts and open new ones and the time that this
> would require.
>
> 32.     AFI sought to work with Wells Fargo in closing its
> accounts and transitioning its banking relationship to another bank,
> but Wells Fargo repeatedly was uncooperative with and
> unresponsive to AFI's efforts to accomplish this.
>
> 33.     Thus, despite AFI's efforts, it was impossible to close the
> more than 30 accounts AFI held with Wells Fargo by Wells
> Fargo's unreasonable, unilateral deadline.

(Compl. ¶¶ 29–33.)  The crux of AFI's breach of the implied covenant claim is paragraph 32,

stating that Wells Fargo was "uncooperative" in and "unresponsive" to AFI's efforts to close its

accounts and transition to a new bank.  (*Id.* ¶ 32.)  The problem with this allegation is that AFI

fails to specifically allege how Wells Fargo was "uncooperative" and "unresponsive."  (*See id.*)

To the extent AFI seeks to link the allegation in paragraph 32 to the allegations in

paragraphs 29 and 30—that Wells Fargo had knowledge and/or was put on notice that AFI's

accounts were complex and that several checks were drawn on the accounts—the breach of the

implied covenant of good faith and fair dealing claim fails and is **DISMISSED with prejudice**.

AFI presumably had knowledge at the time it entered into the CDA with Wells Fargo that the

commercial deposit accounts it sought to open would be complex and that AFI would draw

several checks on those accounts.  Since AFI had knowledge of such facts, AFI also had

knowledge, as it alleges Wells Fargo should have had after AFI notified it, that AFI would likely

require more than 30 days to close such accounts when it executed the CDA.  To hold Wells

Fargo liable for the breach of the implied covenant on the basis of these allegations, would be to

hold that Wells Fargo had an obligation that it did not otherwise have under the express terms of

the CDA (i.e. to take into account AFI's ability to abide by the 30 day opt-out term of the CDA

when making its business determination to amend the agreement within its rights).  *See id.* ("In

order to find that the defendant has breached its duty it would be necessary to read into the

Agreement an obligation that the defendant make business choices with the growth of the

[plaintiff] in mind.  Implying such an obligation under the Agreement would be inconsistent with

the limiting language of the [relevant provision of the original contract] and is thus beyond the

scope of the duty of good faith and fair dealing.").  AFI did not bargain for that obligation to be

imposed upon Wells Fargo in exercising its rights under the Amendment Provision and cannot

use the implied covenant to read that obligation into the provision.  Rather, AFI should have

bargained for more than 30 days to close its accounts under the change of terms provision prior

to executing the CDA.  AFI cannot use this theory of breach of the implied covenant of good

faith and fair dealing to circumvent the terms it contracted for.

To the extent, however, AFI's breach of the implied covenant claim seeks to link

paragraph 32 with the allegation in paragraph 31, AFI's claim may be viable.  Paragraph 31

alleges that Wells Fargo had certain procedures in place that had to be followed in order for AFI,

or any Depositor, to close an account with Wells Fargo; such procedures included Wells Fargo's

prior approval of the closure and the timing of which were (allegedly) subject to Wells Fargo's

control.  (Compl. ¶ 31.)  Once AFI notified Wells Fargo, as alleged in the Complaint, that it

sought to reject the Amendment and close its accounts, Wells Fargo was under an obligation to

act in good faith and deal fairly.  If Wells Fargo was "uncooperative" and "unresponsive" with

respect to carrying out its required procedures for closing the accounts, AFI may be able to prove

that Wells Fargo breached its implied duty.  As currently alleged, however, the Complaint does

not adequately plead this theory of breach.  The Court therefore **GRANTS** the Motion and

**DISMISSES without prejudice** the breach of the implied covenant of good faith and fair

dealing claim to the extent it is based on Wells Fargo's conduct in carrying out its account

closure procedures.   The Court further **GRANTS** AFI leave to amend its Complaint to more sufficiently allege this claim.

### D.        The December 10, 2013 Release Agreement Issue Is Moot

In its Motion, Wells Fargo asserts that to the extent any of AFI's claims rely upon the allegation that the attorneys' fees incurred by Wells Fargo were unreasonable, such claims are precluded by the December 10, 2013 Release Agreement.  AFI does not dispute this preclusion in its Opposition.  As such, the issue is moot and need not be resolved by the Court.

### III.        CONCLUSION

For the foregoing reasons, Wells Fargo's Motion is **GRANTED** and the Complaint is **DISMISSED** in its entirety.  AFI's request for declaratory relief, and claims for breach of contract, conversion, and breach of the implied covenant of good faith and fair dealing claim, to the extent it is based on Wells Fargo's "uncooperative" or "unresponsive" behavior after having been notified of the complexity of and amount of checks drawn on the accounts, are **DISMISSED with prejudice**.  AFI's breach of the implied covenant of good faith and fair dealing claim, to the extent it is based on Wells Fargo's conduct in carrying out its account closure procedures, is **DISMISSED without prejudice** and the Court **GRANTS** AFI leave to amend.  AFI may amend its Complaint, subject to the holding of this Opinion, within thirty days from the date of this Order.  Wells Fargo shall file a response to any further amended complaint within thirty days after an amended complaint is filed.[9]

---

[9]        At this stage in the Adversary Proceeding, the parties have not consented to this Court entering a final order or judgment, raising a potential issue under *Stern v. Marshall*, 564 U.S. ---, 131 S.Ct. 2594 (2011).  Because this Opinion provides AFI with leave to amend one of its claims and does not dismiss the Complaint with prejudice in its entirety, this Opinion is an interlocutory order, not a final judgment on the merits and the Court need not address the *Stern v. Marshall* issue at this time.  *See O'Toole v. McTaggart (In re Trinsium Grp., Inc.)*, 467 B.R. 734, 740–41 (Bankr. S.D.N.Y. 2012) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in non-core proceedings, or in core proceedings as to which the bankruptcy court may not enter final orders or judgments consistent with Article III absent consent, has been reaffirmed by the courts that have had occasion to address the issue." (citations omitted)).

**IT IS SO ORDERED.**

Dated:  May 12, 2015
        New York, New York

_Martin Glenn_____
MARTIN GLENN
United States Bankruptcy Judge